[Crim. No. 3879. First Dist., Div. One. June 26, 1961.]

THE PEOPLE, Respondent, v. EDWARD JOSEPH
CROWLEY, Appellant.

Irving Shore, under appointment by the District Court of Appeal, Sloane & Shore, Paul E. Sloane, Marvel Shore and Dwight C. Steele for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith, and John L. Burton, Deputy Attorneys General, for Respondent.

BRAY, P.J.—Defendant having waived a jury trial was convicted by the court of violation of section 11500, Health and Safety Code (possession of heroin). He appeals.

### QUESTION PRESENTED

Did the seizure of heroin in the hand of defendant constitute an unlawful seizure?

While in his brief defendant contended that the actions of the police in seizing the narcotic in defendant's hand brought the case within the rule of *Rochin* v. *California* (1952), 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], at oral argument defendant's counsel withdrew this contention,

stating that if the police had the right to enter the lavatory with defendant, their actions thereafter were not in violation of the Rochin rule nor the rights of defendant. It is therefore unnecessary for us to discuss the Rochin case.

### Evidence

Sergeant Gadsby of the San Jose Police Department received information from one Garcia who was then in custody charged with passing forged payroll checks, that Garcia was involved in a ''check ring'' which involved a large number of persons; that a certain service station owner had obsolete Standard Station checks which he was giving to check passers for a commission; that Garcia and defendant had gone together to that service station and obtained such checks; that Garcia had given Sergeant Gadsby information concerning five other check passers which information proved to be reliable. The sergeant attempted to locate defendant. Not having done so, he asked Sergeants Chapman and Willis to be on the lookout for him and ''bring him in . . . explaining to them that it was conspiracy or 470 charge.'' Sergeant Gadsby did not have a complaint against defendant prepared because he was not sure ''whether it would be 182 or 470'' (evidently referring to Pen. Code, § 182, conspiracy, and § 470, forgery).

Sergeants Chapman and Willis located defendant about 8 or 9 o'clock at night in a card room at Alviso. Defendant was seated at a table playing cards with eight or nine other men. As the officers entered the room, the dealer, or ''house man,'' saw them, nudged defendant, whispering something to him. The officers approached defendant, showed their badges and told him ''we wanted him for some questioning,'' and to come down to the station. Defendant said, ''All right,'' got up, cashed in his chips, and started to go with the officers, who ranged themselves one on each side of him.

Defendant then said he wanted to go to the lavatory, and wanted the officers to wait outside, saying, ''I can't run away from in there, and there's no need for you to go in, too.'' The officers said that if he went into the lavatory they would go with him. All three went in together. At this time defendant appeared ''very nervous, which gave us some indication that something was wrong.'' Defendant hesitated for a minute, then it became obvious to the officers that defendant was in there for something else than urination. He got hold of some toilet paper, hesitated, ''stood around and looked around a

few minutes,'' and then pulled out a small box from his left front pants pocket and started to drop the box in the toilet paper. Sergeant Chapman said he immediately thought of narcotics because he was under the impression that defendant had a prior arrest for narcotics and because that was the usual way persons having narcotics got rid of them. Sergeant Willis testified that a police lieutenant had told him that defendant had been ''in for pills.'' (The officer was wrong about the prior conviction.) Sergeant Chapman grabbed for the box, ordering defendant to drop it. Defendant did not.

A struggle then ensued between the two officers and defendant, during which Sergeant Chapman was shouting to defendant, ''Drop it!'' The struggle ended only when Sergeant Willis hit defendant on the head with his pistol. Sergeant Chapman was then ''being tossed around quite violently.'' Sergeant Willis thought he saw a knife in defendant's hand. The box contained heroin, and the officers found, additionally, on defendant's person or on the floor beneath him a bindle of heroin, other capsules and pills, and a hypodermic needle. Some of the pills were dexamil, a stimulant.

1. *Seizure legal.*

The basic question here is whether defendant's actions at the time the heroin was seized were so suspicious as to cause the officers reasonably to suspect that defendant was attempting to get rid of contraband. There are many cases which consider the question of what kind of conduct on the part of a defendant comprises reasonable and probable cause justifying arrest and search. Each case depends upon its own circumstances, and each differs from the other. Some have considered the conduct of the particular defendant as justifying search and seizure, and arrest, and others have held the conduct not sufficient therefor. ██ Justice White in *People* v. *Ingle* (1960), 53 Cal.2d 407, 412 et seq. [348 P.2d 577], has set forth the test: ''Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case. [Citations.] ██ Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a

crime. [Citations.] █ Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. [Citation.]

█ "Where an arrest is lawful the search incident thereto is not unlawful merely because it precedes rather than follows the arrest. [Citations.]" (Pp. 412-413.)

There can be no doubt that the actions of defendant in the lavatory were so suspicious as to justify the officers in seizing the box which it was obvious that defendant was seeking to destroy. Defendant contends, however, that the officers had no right to accompany him into the lavatory, and that in doing so they violated his right of privacy.

█ There are a number of cases holding that there is nothing unreasonable in an officer questioning persons concerning a crime where the officer has reason to believe that the person has some knowledge of it. (See *People* v. *Blodgett,* 46 Cal.2d 114, 117 [293 P.2d 57], and cases there cited; also *People* v. *Sanchez* (1961), 189 Cal.App.2d 720, 724 [11 Cal. Rptr. 407].) In *Blodgett* it was held that the officers were not acting unreasonably in ordering persons for purposes of questioning to get out of the cab in which they were then seated.

█ "There is certainly nothing unreasonable about police seeking an interview with a suspect or witness, calling upon him for that purpose wherever he may be found—at his home [citations], place of employment [citation] or in an automobile [citations] and questioning him, where the circumstances appear to warrant such action." (*People* v. *Sanchez,* *supra,* 189 Cal.App.2d at p. 724.) We are not required to determine, since defendant went willingly, whether, had be objected to going with the officers, they could have compelled him to go without arresting him. The information given by the reliable informer would have justified an arrest for forgery. (See *People* v. *Boyd* (1958), 162 Cal.App.2d 332, 334 [327 P.2d 913].)

█ Nor was it unreasonable under the circumstances for the officers to insist on going into the men's room with him. It is a matter of common knowledge, and, of course, one well known to all police officers, that a much-used method of getting

ride of evidence or contraband is to flush it down a toilet. Moreover, in spite of defendant's assurance that he could not run away from the rest room, the officers wanted to make sure that he did not, which was a reasonable precaution for them to take. His nervousness when told that the officers would accompany him into the rest room, would reasonably put the officers on guard for some unlikely event. This was a public toilet available to all in the card room including the officers. Ordinarily, common courtesy requires that one does not enter a one-bowl toilet room when it is occupied. However, here the officers had just informed defendant that he was wanted for questioning. They knew from defendant's nervousness, in addition to the information that had been supplied them, that defendant must be thinking about his connection with the check-passing ring. When he suddenly, as they approached the front door, wanted to go to the lavatory, they had the right to assume either that he was going to elude them or possibly to get rid of stolen checks.

Under such circumstances the officers had the right to keep defendant under surveillance and not let him get out of their sight. At any time he could have refused to go further with the officers as they had not placed him under arrest, but he did not do so. Had he notified them that he would go no further with them and was going alone into the lavatory, they would have been forced to either arrest him or let him go. But he did not so notify them. It clearly appears that he intended to accompany them to the station, but was going to attempt to get rid of the contraband he possessed. There was no violation of his privacy nor was he deprived of due process. After disclosing that defendant was wanted for questioning it would have been unreasonable for the officers to let him out of their sight.

Arriving in the men's room it was obvious to the officers that defendant had entered for some purpose other than the normal use of the toilet facilities. Defendant then produced the box and did not obey when Sergeant Chapman told him to drop it. (See *People* v. *Vegazo*, 191 Cal.App.2d 666 [13 Cal.Rptr. 22], where this court held that a furtive attempt to get rid of a marijuana cigarette held in the defendant's hand justified the officer in seizing the cigarette.) Defendant's actions were both furtive and suspicious. They indicated that he was either attempting to destroy evidence of his connection with the forgery or what immediately flashed into the officers'

minds, that he was trying to dispose of narcotics. It would have been unreasonable for the police to permit defendant to get away with his purpose. Under the circumstances defendant's suspicious actions justified the officers in going into the lavatory with him. Then, in the lavatory his furtive actions presented probable cause for the seizure and arrest. There was no time for the officers to get a warrant or even to comply with section 841, Penal Code (requiring the officer to inform the person to be arrested of the reason therefor). (See *People* v. *Scott*, 170 Cal.App.2d 446, 453 [339 P.2d 162].)

This case cannot be likened to a case of illegal search as when police accost an individual on the street who is doing nothing illegal nor acting suspiciously and as to whom the officers had no prior information, such as was the case in *People* v. *Brown* (1955), 45 Cal.2d 640 [290 P.2d 528]; *Gascon* v. *Superior Court* (1959), 169 Cal.App.2d 356 [337 P.2d 201]; and *People* v. *Harvey* (1958), 156 Cal.App.2d 516 [319 P.2d 689].

In the following cases the particular defendant's action in attempting, when confronted by police officers, to dispose of an article which later was found to contain a narcotic, was held to be furtive and suspicious: *People* v. *Amado* (1959), 167 Cal.App.2d 345 [344 P.2d 254]; *People* v. *McMurray* (1959), 171 Cal.App.2d 178 [340 P.2d 335]; *People* v. *Pendarvis* (1960), 178 Cal.App.2d 239 [2 Cal.Rptr. 824]; *People* v. *Hernandez* (1961), 188 Cal.App.2d 248 [10 Cal.Rptr. 267]; *People* v. *Escoto* (1960), 185 Cal.App.2d 599 [8 Cal. Rptr. 488]; *People* v. *Hurst* (1960), 183 Cal.App.2d 379 [6 Cal.Rptr. 483]; *People* v. *Robles* (1960), 183 Cal.App.2d 212 [6 Cal.Rptr. 748]; *People* v. *Williams* (1959), 175 Cal.App.2d 774 [1 Cal.Rptr. 44]; *People* v. *Taylor* (1959), 174 Cal.App.2d 448 [344 P.2d 837]; *People* v. *Anders* (1959), 167 Cal.App.2d 65 [333 P.2d 854]; *People* v. *Cisneros* (1958), 166 Cal.App.2d 100 [332 P.2d 376]; *People* v. *Cantley* (1958), 163 Cal.App.2d 762 [329 P.2d 993]; *People* v. *Sanson* (1957), 156 Cal.App.2d 250 [319 P.2d 422].

 Although originally the only information the officers had concerning defendant did not relate to narcotics (except that Sergeant Willis had been told that defendant had been in before for "pills"), that fact did not compel the officers to refrain from acting when the suspicious actions of defendant indicated to them that he was trying to get rid of contraband of some sort, probably narcotics. Defendant's actions indi-

cated a typical method of getting rid of a narcotic. The officers immediately and reasonably suspected that defendant possessed narcotics, and acted accordingly. The situation here was somewhat similar to that in *People* v. *Blodgett, supra,* 46 Cal.2d 114. There the officers, without any previous information concerning the defendant, ordered him and others out of a cab which was parked in front of a hotel at 3 a. m. The officers desired to talk to the cab occupants. Before the defendant left the cab he was seen to withdraw his left hand from behind the seat at the juncture of the seat and the back cushion. Investigation disclosed marijuana cigarettes at this place. After holding "There is nothing unreasonable in an officer's questioning persons outdoors at night," the court said: "Since Officer Barker saw defendant's furtive action in getting out, he had reasonable grounds to believe that he was hiding contraband and the search of the cab was therefore reasonable." (P. 117.)

Applicable here is this language in *People* v. *Jiminez* (1956), 143 Cal.App.2d 671, 674 [300 P.2d 68]: "It is a natural impulse on confrontation to hide immediately any contraband, and one cannot be heard to complain that he . . . has betrayed the presence of illegal goods by the alacrity with which he attempted to conceal them."

The judgment is affirmed.

Tobriner, J., and Duniway, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 23, 1961.